UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

JAMES GEHRMAN, et al.,   )
           )
   Plaintiffs,    )
           )
v.          )  1:14-cv-00341-JCN
           )
TWIN RIVERS PAPER COMPANY, )
           )
   Defendant    )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

In this action, Plaintiffs James Gehrman, Michael Reider, and Ronald Guay allege that Defendant Twin Rivers Paper Company breached their employment contracts by failing to make payments pursuant to a severance agreement.[2]  The Court held a three-day trial, and the parties subsequently filed written closing arguments.

### FINDINGS OF FACT

Based on the evidence at trial, the Court finds the following facts:

1. In 2006, Fraser Papers Inc. (Fraser) developed a severance policy for its employees known as the Fraser Papers Inc. Severance Pay Guidelines (Fraser Papers Guidelines).

2. The Fraser Papers Guidelines provide for a lump sum severance payment to eligible employees.

---

[1]  The parties have filed a consent authorizing the undersigned to conduct any and all proceedings and to enter a final order and judgment in this matter.  (ECF No. 44.)

[2]  In the alternative, Plaintiffs assert claims of quasi-contract and unjust enrichment, and violations of the Employee Retirement Income Security Act and related regulations.  Plaintiffs also asserted a claim under Maine's unpaid wages statute, 26 M.R.S. § 626, which claim the Court dismissed for failure to state a claim.  (Report and Recommended Decision on Defendant's Motion to Dismiss, ECF No. 21; Order Affirming the Recommended Decision, ECF No. 24.)

3. In April 2010, Twin Rivers Paper Company (Twin Rivers or Defendant) acquired Fraser's assets.  Following the acquisition, Twin Rivers continued to employ many former Fraser employees.

4. Twin Rivers operates a pulp plant in Edmundston, New Brunswick, Canada, a paper manufacturing facility in Madawaska, Maine, and various saw mills and wood processing plants in New Brunswick and Maine.

5. Plaintiffs are former management-level employees of Twin Rivers.  Twin Rivers terminated Plaintiffs' employment as of June 7, 2013.

6. After Twin Rivers' acquisition of Frasers' assets, Twin Rivers used the Fraser Papers Guidelines terms to pay severance to its employees, including former Fraser employees. In or about February or March 2011, Twin Rivers paid a former Fraser employee in a lump sum the full extent of the severance benefits payable under the Fraser Papers Guidelines.

7. In May 2011, Twin Rivers modified the Fraser Papers Guidelines to provide that the former Fraser employees would be paid four additional weeks of severance rather than receiving a credit for the length of the employees' prior service with Fraser.

8. At the time Twin Rivers acquired Fraser's assets, Twin Rivers' controlling shareholder was Brookfield Asset Management (Brookfield).  Brookfield's principal location is Toronto, Canada.

9. After the acquisition of Fraser, Brookfield attempted to sell Twin Rivers or, alternatively, sell its interest in Twin Rivers.

10. At the time Brookfield was marketing Twin Rivers, Plaintiffs were members of Twin Rivers' management team.  As an incentive to retain Plaintiffs' employment while

Brookfield attempted to sell Twin Rivers, Twin Rivers proposed and Plaintiffs accepted

the terms of a Change of Control agreement, which provided in pertinent part:

> In the event of a Change of Control of Twin Rivers Paper Company (defined as a person or entity other than a current shareholder acquiring control over greater than fifty per cent (50%) of the equity of the Company) and:
>
> a. You are not offered employment on substantially the same terms and conditions, commencing forty-five (45) days after the Change of Control and lasting for a period of thirty (30) days thereafter, you will be entitled to resign your employment and receive a lump sum payment equal to fifteen (15) months of your base salary; or
>
> b. You are not offered employment after the Change of Control, you will be entitled to receive a lump sum payment equal to fifteen (15) months of your base salary.

11. The terms of the Change of Control agreement did not provide that the payment upon a change of control would be in lieu of or would substitute for any severance benefits to which Plaintiffs might be entitled.  When presented with the draft Change of Control agreement for his review, Bill Peterson, Twin Rivers' human resources manager, asked company officials whether they wished to include such language.  After considering the issue, company officials decided to proceed without any preclusion language in the Change of Control agreement.

12. Brookfield entered into negotiations in May and June 2013 with a buyer for its controlling interest in Twin Rivers.  As the result of the negotiations, Brookfield sold its interest in Twin Rivers to private equity firms Atlas Holding and Blue Wolf Capital Partners.  After the sale, on June 7, 2013, Plaintiffs' employment with Twin Rivers was terminated.

13. On June 6, 2013, the day before Plaintiffs' employment was terminated, upon Plaintiff Reider's request for a copy of the severance policy, Kim Lavoie, the Director of Corporate Human Resources for Twin Rivers, and the person responsible for the

administration of and distribution of the company's policies, sent Plaintiff Reider a copy of the Fraser Papers Guidelines with a note that read: "Twin Rivers continues to use the severance pay guidelines that were established in 2006.  In addition to the attached guidelines, for those that were employed by Fraser Papers they are entitled to an additional 4 weeks of severance pay."

14. Upon termination of their employment, Plaintiffs were paid the benefit to which they were entitled under the Change of Control agreement.

15. Twin Rivers' human resources manager, Bill Peterson, was responsible for updating the company's severance policy.

16. Mr. Peterson drafted a document entitled Twin Rivers Paper Company Severance Benefit Plan and Summary Plan Description (the Summary Plan) in May 2011.

17. Mr. Peterson shared with management a draft of the Summary Plan.  Mr. Peterson intended to draft the Summary Plan to be a plan under the Employee Retirement Income Security Act (ERISA).  The Summary Plan included the following provision:

> B.      Benefits under this Plan are not intended to duplicate such benefits as workers' compensation, wage replacement benefits, disability benefits, severance pay, or similar benefits under other benefit plans, severance programs, employment contracts, or applicable laws, such as the WARN Act. Should such other benefits be payable, the benefits under this Plan will be reduced accordingly or, alternatively, benefits previously paid under this Plan will be treated as having been paid to satisfy such other benefit obligations.  In either case, the Plan Administrator will determine how to apply this provision, and may override other provisions in this Plan in doing so.

> C.      If an eligible employee has executed an employment or severance agreement with the Company which expressly provides for severance pay, the employee shall be entitled to the greater of the benefits under this Plan or the benefits under the agreement; you shall not be eligible to receive benefits under both.

18. The Summary Plan was circulated among management personnel to solicit comment. After receiving comments, in June 2011, Mr. Peterson forwarded a copy of the draft to Pierre McNeil of Brookfield.  Mr. McNeil reported that the draft was fine.

19. In or around July 2011, the word "FINAL" was placed on the draft prepared by Mr. Peterson.  The plan with the word "FINAL" was included among the documents in the data room for review by potential purchasers of Twin Rivers.[3]

20. Certain email communications among some of the members of the management of Twin Rivers in 2011 included a copy of the Summary Plan with the designation of "FINAL," but the substance of the email communications demonstrates the Summary Plan had not been adopted at that time despite the "FINAL" designation.  The email communications were evidently part of the discussion regarding the status of the Summary Plan.

21. Under Twin Rivers' policy, Mr. Guay's signature was required on the Summary Plan for its adoption.  Mr. Guay never signed the Summary Plan.

22. When Mr. Peterson resigned from Twin Rivers on July 29, 2011, Twin Rivers had not adopted the Summary Plan.

23. The Summary Plan was not included within a folder of the Twin Rivers' approved policies as of August 2011.

24. In January 2012, in a written policy inventory, Twin Rivers described the Summary Plan as in the "final stage."  Some of the other policies listed in the inventory were described as "finalized".

---

[3] At trial, Plaintiffs moved orally to exclude certain evidence related to and foreclose Defendant from making an argument regarding the information in the data room because the evidence was not disclosed earlier.  The Court concludes the information is not inconsistent with other information produced in discovery and that any delay in the production of the information was not deliberate.  The Court, therefore, denies the motion.  (ECF No. 63.)

25. Twin Rivers' Board of Directors did not vote to approve the Summary Plan prior to the termination of Plaintiffs' employment.

26. Twin Rivers did not publish the Summary Plan to its employees prior to the termination of Plaintiffs' employment.

27. Plaintiffs requested, but were denied severance benefits under the Fraser Papers Guidelines.  When Twin Rivers denied Plaintiffs' requests, Twin Rivers cited the language in the Summary Plan that provided an employee was not entitled to recover severance benefits if the employee received benefits under another severance plan.

28. When Twin Rivers terminated the employment of one of its employees, Twin Rivers required the employee to execute a Severance Agreement and General Release.  Twin Rivers did not require Plaintiffs to sign a Severance Agreement and General Release when they received their payment under the Change of Control agreement.

29. On forms filed with the Maine Department of Labor in connection with the applications of Plaintiffs Guay and Reider for unemployment compensation benefits after the termination of Plaintiffs' employment, which forms included a line on which Defendant could enter the amounts paid to Plaintiffs Guay and Reider for severance, Defendant did not identify the payment made pursuant to the Change of Control agreement as severance. The forms list the following types of income: vacation pay, severance, wages in lieu of notice, holiday pay, bonus and "other."  Defendant did not list any income for severance.  Instead, under "other," Defendant wrote "Change in Control" and listed the amount paid to Plaintiffs Guay and Reider.

30. Under the framework of the Fraser Papers Guidelines as applied by Defendant before the termination of Plaintiffs' employment, Plaintiff Gehrman would be entitled to severance in the amount of $115,384.61; Plaintiff Reider would be entitled to severance

in the amount of $94,230.76; and Plaintiff Guay would be entitled to severance in the amount of $47,538.46.[4]

## CONCLUSIONS OF LAW

Plaintiffs assert they are entitled to payment of severance, regardless of which severance policy applied, and payment under the terms of the Change of Control agreement. Defendant contends Plaintiffs are not entitled to receive a severance payment separate from the payment due under the Change of Control agreement. In support of its argument, Defendant cites the terms of the Summary Plan, which provide that the benefits under the Plan, including severance, are not intended to duplicate severance benefits otherwise payable to a terminated employee. Finally, Defendant maintains the Summary Plan is a qualified ERISA plan.

The case thus potentially presents the following issues: (1) which severance plan or policy governs Twin Rivers' obligation to Plaintiffs upon the termination of Plaintiffs' employment in June 2013; (2) how the Change of Control agreement relates to Twin Rivers' severance obligation to Plaintiffs; and (3) is the applicable plan or policy an ERISA plan, and, if so, does the administrative record require supplementation.[5]

### A. The Fraser Papers Guidelines and the Summary Plan

Plaintiffs in essence argue Defendant breached its contract with them to pay severance benefits. As the parties asserting breach of contract, Plaintiffs must demonstrate the existence of an agreement to pay severance. *Aquila, LLC v. City of Bangor*, 640 F. Supp. 2d 92, 97–98 (D. Me.

---

[4] Plaintiffs would be entitled to the same amount under the Summary Plan if it applied and if the Summary Plan did not, as Defendant asserts, preclude recovery for the benefits under both the Change of Control agreement and the Summary Plan.

[5] In the Report of Final Pretrial Conference and Order, the Court advised the parties that, "[i]n the event the Court determines after trial that the applicable plan is an ERISA plan, the Court will afford the parties the opportunity to supplement the administrative record before the Court determines whether Plaintiffs are entitled to benefits under the ERISA plan." (ECF No. 53 at 1.)

2009); *Gray v. TD Bank, N.A.*, 2012 ME 83, ¶ 14, 45 A.3d 735, 740.  Plaintiffs have established that Defendant was obligated to pay severance benefits.  In fact, Defendant does not contest that it was contractually obligated to pay severance benefits upon the termination of Plaintiffs' employment.

The parties disagree, however, as to which severance plan or policy governs the benefits to which Plaintiffs are entitled.  Plaintiffs maintain the Fraser Papers Guidelines as modified in 2011 (i.e., four additional weeks of severance for former Fraser employees rather than credit for the length of their service) governs their entitlement to severance. [6]  Defendant contends Plaintiffs' entitlement to severance benefits is governed by the Summary Plan.  Although the amount of the severance benefit would be the same under both policies, Defendant argues that under the terms of the Summary Plan, Plaintiffs cannot recover both the benefits under the Change of Control agreement and the Summary Plan.

In the absence of an express assignment of employment agreements, whether a successor through an asset purchase assumes existing employment agreements when it retains existing personnel is generally determined based on the instruments executed by the parties, and from surrounding circumstances.  *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 721 (7th Cir. 2003) (applying Illinois law); *Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co.*, 682 F.2d 12, 18 (1st Cir. 1982) ("the primary goal of contract interpretation is to ascertain the intentions of the parties").

Although Defendant contends that it never adopted the Fraser Papers Guidelines, the circumstances of the sale and Defendant's conduct following the sale demonstrate Defendant's intent to assume Fraser's employment agreements, including Fraser's obligation to pay a severance

---

[6] Plaintiffs do not contest Defendant's modification of the Fraser Papers Guidelines to provide for an additional four weeks of severance for former Fraser employees in lieu of payment for the entire length of their service.

benefit.   Following the sale, Defendant continued to employ the Fraser employees.   When Defendant acquired Fraser's assets in 2010, the Summary Plan did not exist.   Consistent with the lack of any other potential severance policy, and in accordance with its decision to continue to employ Fraser employees, in or about February or March 2011, Defendant used the Fraser Papers Guidelines to calculate the severance benefit payable to a former Fraser employee.   Subsequently, Defendant modified the Fraser Papers Guidelines to provide for the payment of an additional four weeks of severance for former Fraser employees in lieu of credit under the Guidelines for the entire length of the employees' service with Fraser.   Particularly given this history, Defendant's attempt to characterize the use of the Fraser Papers Guidelines to calculate the severance to be paid to an employee in or about March 2011 as "a temporary expedient"[7] is unavailing.   The credible record evidence establishes that Defendant adopted, modified and used the Fraser Papers Guidelines to determine eligibility for and the payment of severance after Defendant acquired Fraser's assets. The credible evidence includes the explicit acknowledgement in 2013 by Defendant's Director of Corporate Human Resources that Defendant continued to use the Fraser Papers Guidelines at the time Defendant terminated Plaintiffs' employment.

Defendant nevertheless contends that subsequent to the purchase of Fraser's assets, Defendant adopted the Summary Plan and that the terms of the Summary Plan control.   In other words, Defendant maintains that it further modified the terms of Plaintiffs' employment and adopted a new severance plan.   When an employer modifies the terms of employment to add new terms that materially alter its employees' rights and benefits, logic suggests the intent to do so must be apparent and that the change must be communicated to the employees.   Otherwise, an employer could unilaterally alter the terms of employment for unknowing employees who might decline

---

[7] Defendant's post-trial brief at page 17. (ECF No. 77.)

other employment opportunities for employment on their incorrect understanding of their employment terms. *Snow v. BE & K Constr. Co.*, 126 F. Supp. 2d 5, 13 (D. Me. 2001) (explaining that an employer can unilaterally change the terms of employment contract, provided that "the normal rules of contract law" are satisfied, including a "manifestation of mutual assent"); *Taliento v. Portland W. Neighborhood Planning Council*, 705 A.2d 696, 701 (Me. 1997) (Lipez, J., dissenting) (explaining that language in an employee handbook can constitute an offer when communicated through dissemination of the handbook, and that the employee's retention of employment with knowledge of language that modifies existing terms of employment can constitute acceptance).

In this case, although Defendant initiated the process to modify the severance policy, Defendant did not complete the process. Defendant argues in part that Defendant's inclusion of the Summary Plan with the word "FINAL" in the data room for potential purchasers to review demonstrates Defendant adopted the Summary Plan. The document in the data room, however, was not signed as required for adoption. In addition, a "final" designation does not equate with the adoption of a policy set forth in a document. Email communications within Twin Rivers in 2011, by which emails the Summary Plan with the "FINAL" designation was circulated as part of a discussion regarding the status of the Summary Plan, demonstrate the Summary Plan had not been adopted despite the "FINAL" designation.

Furthermore, in January 2012, in a written policy inventory intended to describe the status of the company's policies, the Summary Plan was described as in the "final stage." Some of the other policies listed in the inventory were described as "finalized". Defendant, therefore, distinguished between "final stage" and "finalized". One can reasonably conclude that more work or action was necessary for a policy in the "final stage" to be finalized and adopted. Placement of the word "FINAL" on the document is not inconsistent with a draft in the final stage, but not yet

adopted.  In fact, if the plan were adopted, there would be no need to designate the document as "FINAL".  The record suggests that none of the other Twin Rivers' approved policies contained the "FINAL" designation.  Indeed, while the Summary Plan was apparently designated as "FINAL" by July 2011, the Summary Plan was not in an August 2011 folder of "approved policies".  In sum, the designation of the Summary Plan as "FINAL" does not establish that Defendant adopted the Summary Plan.

The objective and most persuasive evidence in fact established that Defendant did not adopt the Summary Plan.  The Twin Rivers Board of Directors never voted to adopt the Summary Plan (i.e., the modification of the severance policy), the Summary Plan was not signed by Plaintiff Guay as required of an approved plan, Twin Rivers never published to all applicable employees the Summary Plan as the governing plan, and when asked in June 2013 for a copy of the severance plan, Defendant's Director of Corporate Human Resources, and the person responsible for the administration of and distribution of the company's policies, sent Plaintiff Reider a copy of the Fraser Papers Guidelines with a note that read: "Twin Rivers continues to use the severance pay guidelines that were established in 2006.  In addition to the attached guidelines, for those that were employed by Fraser Papers they are entitled to an additional 4 weeks of severance pay."

In short, neither the designation of the Summary Plan as "FINAL", nor any of the other evidence of record establishes that Defendant had adopted the Summary Plan at the time Defendant terminated Plaintiffs' employment.[8]  The credible and persuasive evidence establishes that at the

---

[8] In support of its contention that it adopted the Summary Plan, Defendant also notes that between January 2012 and May 2013, it terminated the employment of seven salaried employees and paid severance by salary continuation for six of the employees (consistent with the Summary Plan) and lump sum for one of the employees (consistent with the Fraser Papers Guidelines).  (Defendant's Post-trial Brief at 10, ECF No. 77.)  The fact that other employees might have accepted salary continuation as a means of severance does not establish that Defendant adopted the Summary Plan.  In other words, Defendant cannot agree with some of the employees to alter the terms of employment for all of the employees.  Furthermore, Defendant's lump sum payment to one of the employees suggests Defendant did not adopt the Summary Plan as a severance policy applicable to all employees.

time Defendant terminated Plaintiffs' employment, Defendant had not adopted the Summary Plan. Accordingly, any argument that Plaintiffs' employment terms had been further modified to include the Summary Plan fails. Plaintiffs' entitlement to severance benefits is thus governed by the Fraser Papers Guidelines as modified by Defendant in 2011 (i.e., four additional weeks of severance for former Fraser employees rather than credit for the length of their service).

## B. Applicability of ERISA

Through a motion to dismiss, Defendant argued the Fraser Papers Guidelines were subject to ERISA and thus Plaintiffs' right to severance would be governed by ERISA. Noting the need for a factual record, the Court denied Defendant's motion to dismiss based on ERISA preemption. Although Defendant did not argue in its post-trial submission that the Fraser Papers Guidelines constituted an ERISA plan, because Defendant raised the issue earlier in the case, an assessment of the issue is appropriate. [9]

"Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78 (1995). Significantly, if the applicable severance program was a "welfare benefit plan" for purposes of ERISA, then Plaintiffs' state law contract, quasi-contract, and tort claims[10] are all preempted by ERISA and Plaintiffs must pursue their severance benefits (and related remedies) through their ERISA claims (Second Am. Complaint, Count V – XII). *See* 29 U.S.C. § 1144(a); *Gross v. Sun Life Assur. Co. of Canada*, 734 F.3d 1, 6 (1st Cir. 2013).

---

[9] Because the Court concludes that Plaintiffs' entitlement to severance benefits is based on the framework of the Fraser Papers Guidelines, and that Defendant did not adopt the Summary Plan, the Court will not address Defendant's contention that the Summary Plan is an ERISA plan.

[10] Plaintiffs' state law claims are breach of contract (Count I), breach of quasi-contract (Count II), and unjust enrichment (Count III). (Second Am. Compl., ECF No. 35.) The Court previously dismissed Plaintiffs' claim for unpaid wages under 26 M.R.S. § 626 (Count IV). (Report and Recommended Decision on Defendant's Motion to Dismiss, ECF No. 21; Order Affirming the Recommended Decision, ECF No. 24.)

Because ERISA preemption is an affirmative defense to Plaintiffs' state law claims, *Tompkins v. United Healthcare of New England, Inc.*, 203 F.3d 90, 97 (1st Cir. 2000), the burden rests with Defendant to demonstrate that the applicable severance benefit was an ERISA plan. *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 251 n.2 (2011) ("Federal preemption is an affirmative defense upon which the defendants bear the burden of proof." (quotation marks and brackets omitted)).

ERISA defines welfare benefit plan to mean, inter alia, "any plan, fund, or program … established or maintained by an employer … to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, … benefits in the event of … unemployment …." 29 U.S.C.A. § 1002(1).  "Severance pay arrangements" are expressly included in the list of employee benefits potentially subject to ERISA regulation as an employee benefit plan.  *Id.* § 1002(2)(B)(i), (3).  Furthermore, subject to exceptions that do not exist here, ERISA applies "to any employee benefit plan if it is established or maintained – (1) by any employer engaged in commerce." *Id.* § 1003(a)(1).

Federal courts have concluded that severance pay arrangements are not subject to ERISA unless the severance pay is provided through a plan "established or maintained" by the employer. For example, in *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1 (1987), the United States Supreme Court held that claims brought pursuant to a Maine statute that required the payment of a severance benefit in the event of a plant closure were not preempted by ERISA because the statute did not impose on the employer the obligation to establish or maintain a plan.  *Id.* at 6.  The Court reasoned that "[t]he words 'benefit' and 'plan' are used separately throughout ERISA, and nowhere in the statute are they treated as the equivalent of one another." *Id.* at 8.  According to the Court, regulation of every employee benefit would not serve the purpose behind ERISA – i.e.,

to preempt the field of employee benefit plan regulation – unless the benefit is provided through an employee benefit plan.  Consequently, ERISA preemption only applies "with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation."  *Id.* at 11.

Consistent with *Fort Halifax*, the First Circuit has determined that courts "evaluating whether a given program falls under ERISA," must look to "the nature and extent of an employer's benefit obligations."  *O'Connor v. Commonwealth Gas Co.*, 251 F.3d 262, 266 – 67 (1st Cir. 2001). If the employer's obligations "require an ongoing administrative scheme that is subject to mismanagement, then they will more likely constitute an ERISA plan; but if the benefit obligations are merely a one-shot, take-it-or-leave-it incentive, they are less likely to be covered."  *Id.* at 267. "Where subjective judgments would call upon the integrity of an employer's administration, the fiduciary duty imposed by ERISA is vital.  But where benefit obligations are administered by a mechanical formula that contemplates no exercise of discretion, the need for ERISA's protections is diminished."  *Id.*

"The question of whether an ERISA plan exists is a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person." *Wickman v. Nw. Nat'l. Ins. Co.*, 908 F.2d 1077, 1082 (1st Cir. 1990) (quotation marks omitted). "[A] welfare benefit plan under ERISA requires five essential constituents."  *Id.*  The constituents are:

> (1) a plan, fund or program (2) established or maintained (3) by an employer or by an employee organization, or by both (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits (5) to participants or their beneficiaries.

*Id.* (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1370 (11th Cir.1982) (en banc)).  As to the second element – i.e., that the plan, fund or program be "established or maintained" – the issue is "whether from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Id.* (quoting *Donovan*, 688 F.2d at 1373).  *See also Gross*, 734 F.3d at 6 – 7.

Through several decisions, the First Circuit has addressed whether employer-provided severance benefits were plans subject to ERISA despite the absence of formal ERISA plan documents.[11]  *See O'Connor*, 251 F.3d 262; *Rodowicz v. Mass. Mut. Life Ins. Co.*, 192 F.3d 162, 170 (1st Cir. 1999); *Belanger v. Wyman-Gordon Co.*, 71 F.3d 451, 454 (1st Cir. 1995); *Simas v. Quaker Fabric Corp. of Fall River*, 6 F.3d 849, 854 (1st Cir. 1993).

In *Simas*, the First Circuit considered a Massachusetts "tin parachute" statute that required employers to make certain severance payments to employees terminated following corporate takeovers. 6 F.3d at 851. The statute imposed various administrative burdens to determine qualification for severance and provided that the statute would not apply if the employee was otherwise covered by a more generous severance plan.  *Id.*  Concluding that the Massachusetts statute was more burdensome than the Maine statute at issue in *Fort Halifax*, the First Circuit held that ERISA preempted enforcement.  *Id.* at 853.  The First Circuit's comparison of the two statutes is salient:

> The Maine statute starts and ends with a single, once and for all event, the plant closing, after which all payments are due.  The Massachusetts statute, by contrast, is triggered separately for each three-year employee by the individual termination of that employee within one of several alternative time periods, either before or after the takeover. More important, whether a payment is due depends in Massachusetts not merely on the employee's status as a three-year employee but on

---

[11] The distinction regarding formalized ERISA plan documents is material.  For example, where severance benefits are provided through ERISA plans, ERISA clearly applies.  *See, e.g., Niebauer v. Crane & Co.*, 783 F.3d 914, 917 (1st Cir. 2015); *Liston v. Unum Corp. Officer Severance Plan*, 330 F.3d 19 (1st Cir. 2003).

> whether the employee is also eligible for unemployment compensation under Massachusetts law. This is effectively a cross-reference to other requirements, most importantly that the employee not have been discharged for cause. Mass.Gen.L. ch. 151A, § 25(e)(2) ("deliberate misconduct" or "knowing violation" of employer rule or policy).
>
> Thus, the Maine employer on closing its plant need do little more than write a check to each three-year employee. The Massachusetts employer, by contrast, needs some ongoing administrative mechanism for determining, as to each employee discharged within two years after the takeover, whether the employee was discharged within the several time frames fixed by the tin parachute statute and whether the employee was discharged for cause or is otherwise ineligible for unemployment compensation under Massachusetts law. The "for cause" determination, in particular, is likely to provoke controversy and call for judgments based on information well beyond the employee's date of hiring and termination.

*Id.* at 853. The First Circuit thus placed significant weight on the fact that the Massachusetts statute could involve more than "straightforward" eligibility determinations. *Id.* Additionally, the Court noted that eligibility disputes could require the employer to participate in state agency proceedings. *Id.* The two-year monitoring period also imposed sufficient record-keeping burdens to be considered an ERISA plan from an administrative standpoint. *Id.* In effect, where "the time period is prolonged, individualized decisions are required, and at least one of the criteria is far from mechanical," a program is likely to be deemed a plan for purposes of ERISA. *Id.* at 854.

In *Belanger*, the Court considered the "contention that a series of four early retirement offers … over a four-year period constitute an ERISA plan." 71 F.3d at 452. The defendant, a downsizing company, offered in sequence four early retirement lump-sum payments, over and above the regular retirement benefit, to induce voluntary departures. *Id.* The plaintiffs, who opted for early retirement under the third offer, sued when the fourth offer provided better terms, arguing that their payment was made pursuant to an ERISA plan and that they should benefit from any favorable amendment. *Id.* at 453. The First Circuit affirmed the determination that the benefit was not conferred through an ERISA plan because the benefit did not satisfy the *Fort Halifax* requirement that a plan involve "the undertaking of continuing administrative and financial

obligations." *Id.* at 454.  In particular, the First Circuit emphasized that "the early retirement offers involve[d] precisely the kind of one-time, lump-sum payment that the *Fort Halifax* Court clearly excluded from the pantheon of ERISA plans." *Id.* at 455.  Material to the determination was the "purely mechanical determination of eligibility" and the absence of any "complicated administrative apparatus either to calculate or to distribute the promised benefit." *Id.*  The First Circuit further held that the existence of a series of offers over four years did not change the analysis where the evidence did not suggest any need for "nonmechanical decisionmaking" or a "prearranged design" involving ongoing obligations.  *Id.* at 456.

In *Rodowicz*, the plaintiffs alleged the employer falsely denied the existence of a forthcoming retirement option, causing them to retire under less favorable terms.  192 F.3d at 166.  The Court held that the option, essentially a severance program, did not amount to an ERISA plan.  Citing *Fort Halifax*, the First Circuit concluded that the severance package "was so simple as to fall outside of ERISA."  *Id.* at 170.  The Court's determination was based on multiple considerations, including that the package (1) called for a "one-time bonus offered for [a] two-month period" and therefore "required little in the way of administrative burden or expense," (2) "did not require that the Company make a long-term financial commitment to any employee who chose to participate," (3) did not impose an overly complicated standard to deny the benefit based on involuntary termination, which was authorized "for any reason or no reason at all," (4) "did not require the administrator to make exclusion determinations over an extended period of time," and (5) "imposed no ongoing administrative burdens or financial obligations on the Company."  *Id.* at 171.  The Court reached this conclusion even though the package permitted employees to appeal discretionary decisions to exclude them from participation.  *Id.* at 171 – 72.

Finally, in *O'Connor*, the First Circuit concluded that a "lump-sum severance package … was not an ERISA-covered plan."  251 F.3d at 264.  The employer, a newly consolidated entity,

planned to eliminate fifteen percent of its workforce through, inter alia, a "personnel reduction program" that provided a "severance bonus" and was available "to all non-officer employees during a fifteen-week period," subject to various conditions.  *Id.* at 265.  While the First Circuit suggested that certain aspects of the overall program likely fell within ERISA's protection, it concluded that the severance benefit did not because the burden imposed on the employer was to make a "one-time, lump-sum payment" based on "simple arithmetic."  *Id.* at 267 – 68.  Although the policy identified some criteria and conditions for eligibility, the Court reasoned that the criteria and conditions did not create an ERISA plan because they did not constitute "non-mechanical, subjective criteria that could in their application be subject to employer abuse."  *Id.* at 268.

In summary, the First Circuit has consistently found that where an employee asserts state law claims for benefits provided outside of a formal ERISA plan, the claims are not subject to ERISA preemption where (1) eligibility for benefits can be characterized as employing a mechanical standard that is not subject to abuse; (2) the benefit is provided in a lump sum calculated by simple arithmetic; (3) the employer is not required to oversee any fund or assume a long-term financial commitment; and (5) the employer is not otherwise subject to ongoing administrative burdens.

In this case, Defendant has not cited any facts that would support a finding that the Guidelines constitute an ERISA plan.  The only evidence regarding the operation of the Fraser Papers Guidelines is a copy of the Guidelines and some limited calculations of severance benefits under the Guidelines.  "The 'crucial factor in determining if a "plan" has been established is whether the [proffering of an employee benefit] constituted an expressed intention by the employer to provide benefits on a regular and long term basis.'"  *Belanger*, 71 F.3d at 455 (quoting *Wickman*, 908 F.2d at 1083).  A review of the Guidelines establishes that the Guidelines contemplated a lump sum payment based on a defined computation.  Consistent with the language of the Guidelines,

Defendant made a lump sum severance payment pursuant to the Fraser Papers Guidelines when it terminated the employment of a former Fraser employee in or about February or March 2011. Defendant did not have ongoing management and administrative burdens in connection with the payment of severance. In particular, under the terms of the Guidelines, Defendant was not required to manage a designated severance fund, and Defendant was not required to provide benefits on an ongoing basis. Under the circumstances, the record does not support a finding that the Fraser Papers Guidelines constitute an ERISA plan.

### C. Relationship of Fraser Papers Guidelines and Change of Control Agreement

Under the Fraser Papers Guidelines, Plaintiffs' entitlement to severance benefits is not limited by their receipt of payment under the Change of Control agreement.[12] Similarly, the Change of Control agreement lacks any language which would suggest that a payment under the Change of Control agreement precludes Plaintiffs from recovering a severance payment under the Fraser Papers Guidelines. While the parties could have contracted to limit Plaintiffs to either a severance payment under the Fraser Papers Guidelines or a payment under the Change of Control agreement, they did not do so. In fact, the lack of preclusion language in the Change of Control agreement appears to be deliberate. When presented with the draft Change of Control agreement for his review, Bill Peterson, Defendant's human resources manager, asked company officials whether they wished to include such language. After considering the issue, company officials decided to proceed without any preclusion language in the Change of Control agreement. Based

---

[12] Even if the Summary Plan applied, Defendant would not necessarily prevail on its preclusion argument. First, despite the fact that the Change of Control agreement was in effect at the time the draft of the Summary Plan was prepared, Defendant did not specifically reference payments under the Change of Control agreement in the "set off" language of the Summary Plan. Had Defendant intended to exclude from severance eligibility the employees who were entitled to change of control payments, Defendant could have explicitly done so. In addition, Defendant could have, but did not, provide in the Change of Control agreement that payment under the Change of Control agreement was Plaintiffs' exclusive means of recovery upon a change of control of the company.

on the plain language of the Fraser Papers Guidelines and the Change of Control agreement, therefore, Plaintiffs are entitled to payment of the severance benefits under the terms of the Fraser Papers Guidelines as applied by Defendant and payment under the Change of Control agreement.

Such a result is not inconsistent with the purposes of the severance and change of control agreements. The agreements are not mutually exclusive. Severance pay was a benefit payable to Plaintiffs and other employees if Defendant terminated their employment regardless of whether control in Defendant's management occurred. Indeed, Plaintiffs had the severance benefit before adoption of the Change of Control agreement. The Change of Control agreement benefit was not available to all employees. Rather, the benefit was an incentive to convince certain company executives (e.g., Plaintiffs) to remain with Defendant while Defendant's owners actively attempted to sell the business. Without such an incentive, Plaintiffs would understandably be concerned about their future employment and would reasonably seek other employment opportunities. If Plaintiffs obtained other employment and left Defendant's employ while Defendant's owners were marketing the company, Defendant's ability to function effectively and its value to prospective purchasers could be compromised. The Change of Control agreement is thus consideration for Plaintiffs' agreement to stay with Defendant through the sale. Consistent with this distinction, on forms filed with the Maine Department of Labor in connection with the applications of Plaintiffs Guay and Reider for unemployment compensation benefits, Defendant specifically did not characterize the payment under the Change of Control agreement as severance. Rather, although the forms included a specific line for Defendant to report any severance pay Plaintiffs received, Defendant did not report any severance income. Instead, Defendant described the payment under the Change of Control agreement as "other" income.[13]

---

[13] On Department of Labor forms, Defendant was asked to provide the income for Plaintiffs Guay and Reider. The form lists the following types of income: vacation pay, severance, wages in lieu of notice, holiday pay, bonus and

### D.  Plaintiffs' Damages

The credible evidence established that under the framework of Fraser Papers Guidelines employed by Defendant, Plaintiff Gehrman is entitled to severance in the amount of $115,384.61; Plaintiff Reider is entitled to severance in the amount of $94,230.76; and Plaintiff Guay is entitled to severance in the amount of $47,538.46.

### CONCLUSION

Based on the foregoing findings and conclusions, Plaintiffs have prevailed on their breach of contract claim and are entitled to judgment.  Accordingly, judgment shall enter in favor of Plaintiff Gehrman and against Defendant on Count I of the Second Amended Complaint in the amount of $115,384.61 plus interest and costs; judgment shall enter in favor of Plaintiff Reider and against Defendant on Count I of the Second Amended Complaint in the amount of $94,230.76 plus interest and costs; and judgment shall enter in favor of Plaintiff Guay and against Defendant on Count I of the Second Amended Complaint in the amount of $47,538.46 plus interest and costs.[14]

SO ORDERED.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 5th day of October, 2016.

---

"other."  Defendant did not list any income for severance.  Instead, under "other," Defendant wrote "Change in Control" and listed the amount paid to Plaintiffs Guay and Reider.

[14] Because the Court has concluded that Plaintiffs are entitled to judgment on the breach of contract claims, the Court does not address and thus moots Plaintiffs' alternative claims of quasi-contract and unjust enrichment (Counts II and III of the Second Amended Complaint).  Because the Court concludes the applicable severance policy is not an ERISA plan, Plaintiffs' ERISA claims (Counts V – XII) are dismissed.